———o———

No. 6859.

# FERNAND REYNAUD, ET AL., v. A. & J. E. CHAMPAGNE.

### Syllabus.

Where several parties have a common interest they may be joined as plaintiffs or defendants in the same suit.

A planting partnership claiming possession of lands may be made defendant in a petitory action.

It is not necessary that the description of property demanded in a petitory action should be described with absolute certainty.

Measurements and boundaries established by a survey made at the request of a previous owner will be binding upon subsequent purchasers until showed to be incorrect.

Limits fixed by a survey made without notice to neighbors are null and of no effect.

Appeal from the 28th Judicial District Court, Parish of St. John the Baptist, No. 298; Honorable Prentice E. Edrington, Judge. Affirmed.

James Wilkinson, for plaintiff and appellee.

James Legendre, for defendant and appellant.

His Honor, CHARLES F. CLAIBORNE, rendered the opinion and decree of the Court, as follows:

This is a petitory action coupled with a prayer for damages for trespass.

Plaintiffs are seven in number; they allege that together they are the owners of Section 37 in T. 12 S., R. 19 East, in the S. E. District of Louisiana, West of the Mississippi River in the Parish of St. John the Baptist, measuring two arpents front on said river by forty arpents deep;

That the plaintiffs do not own the above tract of land in indivision, but each owns a separate tract varying in feet front on the river by the whole depth of 40 arpents;

They further averred that they and their authors have owned and have been in the actual possession of said property since the year 1820 and before;

That the planting partnership of A. & J. E. Champagne, owners of the Gold Mine Plantation, have, within the past year, trespassed upon and taken possession of a tract of land nearly two arpents in extent, being the rear part of each of petitioners' property;

That the acts of said A. & J. E. Champagne have forced petitioners to employ counsel at an expense of $100, and to procure plans and titles at a further cost of $100, and have damaged them in peace of mind to the extent of $300;

They pray that their titles be recognized to the above lands, and that the said A. & J. E. Champagne be cited and condemned to pay $500 damages and to remove from the property they have trespassed upon.

The defendants excepted to the above petition on the following grounds:

1. That it contained a misjoinder of parties plaintiff, and that the said plaintiffs must assert their rights by separate actions, and

2. That it was vague and indefinite and did not disclose a cause or right of action.

The exceptions were dismissed by the Judge below.

There is no article of the Code of Practice permitting several plaintiffs to join in one action, nor one plaintiff to sue several defendants in one suit; nor is there any article prohibiting it.

The only prohibition is against cumulating "several demands in the same action, when one of them is contrary to or precludes another." C. P. 149. But decisions of our Supreme Court have crystallized the jurisprudence to be that where several parties have a common interest they may be joined, as plaintiffs or defendants in the same suit. Thus it has been held that where A and B are owners of two properties separated by a vacant lot owned by C who improves the lot and makes use of the two walls of A and B, A and B may join in one suit to recover from C his proportion of the cost of the wall. "This mode of proceeding avoids a multiplicity of actions, and saves costs." 3 Rob., 404.

And in 12 A., 74, the Court said:

> "The defendant, Angomar, as well as the other parties defendants, have a right to object to a cumulation of several district causes of action against several defendants, unless they have a common interest to be adjudicated upon in one judgment." Also 14 A., 181; 12 A., 601; 52 A., 1243.

The law abhors a multiplicity of actions against the same person. 15 A., 310; 39 A., 1031.

In 20 A., 254, several holders of notes secured by the same mortgage joined in one suit to foreclose it. Exception was taken to the joinder of the several holders as plaintiffs in the same suit, "which was properly overruled", said the Court, "there not being inconsistent demands cumulated in one action."

181

In *Derbes v. Romero,* 28 *A.,* 644, plaintiffs sued several defendants in a petitory action. "Defendants excepted to the suit on several grounds, the most important being that they each own separate and distinct lots of the land in controversy, and cannot be sued collectively." The Court said: "For the settlement of this question (title) defendants are interested alike, regardless of the extent of their respective claims to the property in dispute. 2 *Howard,* 643, 644." 101 *U. S.,* 699. Affirmed in *Rrd. v. Elmore,* 46 *A.,* 1237 (1240).

In *Gaines v. Chew,* 2 *Howard,* 619 (642, 643), the Supreme Court of the United States said:

> "The object of the rule against multifariousness is to protect a defendant from unnecessary expense; but it would be a great perversion of that rule, if it were to impose upon the plaintiffs and all the other defendants two suits instead of one."

Where several taxpayers joined in one suit against the assessor to compel him to reduce the assessments against the plaintiffs in conformity with an ordinance of the Police Jury, the exception was made that "their petition shows that relators are the owners of separate and distinct pieces of property, and have, therefore, no privity or mutuality of interest, and are not entitled to join in one suit." The Court overruled the exception on the ground that the taxpayers had a common interest to protect. 39 *A.,* 107, 530, 770; 119 *La.,* 17.

In *Madere v. Alexander,* 126 *La.,* 342, a number of persons joined as plaintiffs to sue the defendant for slander uttered on the same occasion. On exception of misjoinder of parties plaintiffs the Supreme Court said:

> "It is inconceivable how the defendant could be benefited by having to litigate in two suits, instead

182

of in one, the matter set forth in the petition. No awkward complication, no confusion, no increased expenses, no inconvenience can possibly result from the joinder."

The same ruling was made in suits for malicious prosecution. 46 A., 1448; 52 A., 1417; and in suits for personal injury, 114 La., 253; 40 A., 178 (181).

In the case of *State ex rel Denis, et als., v. Shakespeare,* 43 A., 92, the Court said, on p. 110:

> "Where there are several persons similarly situated and having a common interest at stake they may be properly joined as plaintiffs. This right has been frequently recognized by us." Authorities 52 A., 1243.

In the case of *Gill v. City,* 119 La., 17, the question of the right to join several parties as plaintiffs or defendants was examined exhaustively and numerous authorities quoted. The case presented the joint petition of a number of property holders and taxpayers protesting against the encroachment of their several properties by a railroad under a city ordinance. The defendants excepted on the ground of misjoinder of parties plaintiffs. The conclusions of the Court were thus summarized in the syllabus:

> "Our Code of Practice makes no provision for determining when parties may or may not be joined either as plaintiffs or defendants. We have to be guided in that regard by the well settled rules of pleadings as found in the books of common law, according to which a large discretion is left to the Court; the aim being to avoid a multiplicity of suits, while not permitting parties to be joined who have not a common interest, or where the defendants would be embarrassed in their defense, or delays would be caused, or complications arise in connection with costs or otherwise."

183

See also *Succession of Justus*, 47 A., 304.

As this action is petitory in its character it was properly "brought against the person who was in the actual possession of the immovable", the defendant partnership of A. & J. E. Champagne. C. P. 43, 5, 182. But the defendants contend that a partnership cannot be made defendant as such because it cannot own or hold real estate. It is doubtful in our minds if this rule applies to particular partnership for planting, the very purpose of which is to own property to carry on its business. C. C. 2836, 3 La., 496. But the question of title and of possession are different; and the defendant admits and asserts possession.

In the case of *Allen West & Bush v. Whetstone*, 35 A., 846, where the plaintiffs, a commercial partnership, brought an action of slander of title, the Court said on page 849:

> "Exception is taken to the capacity of Allen, West & Bush to stand in judgment, because it is a commercial firm and incapable, as such, of owning real estate. The exception is frivolous."

We also consider that the allegations of the petition were sufficient to fully inform the defendant of the objects of the demand, and of the location of the lands claimed. C. P., 172; 46 A., 1238 (1240); 15 A., 159.

The Judge of the District Court dismissed the exceptions and we think properly so.

The defendants then answered denying plaintiffs' title to said lands, and claiming ownership in themselves by title, and by prescriptions of ten and thirty years, and, in the absence of title, claimed a servitude of drain over said lands.

The first question presented for solution on the merits is whether the plaintiffs are owners of the land claimed by them. C. P. 44.

It is not disputed that they are the owners of the lands fronting on the Mississippi River by forty arpents deep. The only contention is that their rear line does not extend up to the rear line claimed by them. Neither the plaintiffs' nor the defendants' titles refer to any plan. But the plaintiffs produced and have filed in evidence a copy of a plan drawn by Louis Bringier, surveyor general of the State of Louisiana, on August 18th, 1829, according to which Widow Ls. D. Sarpy, by an act of Chas. T. Soniat, Notary, dated February 4, 1899, sold to Emile Burch and Angelo Champagne, one of the members of the defendant partnership, the Glendale Plantation, which adjoins on the upper side the lowest tract of land owned by one of the plaintiffs. The description of said plantation, according to the above plan and act of sale, is "forty arpents on the upper line which is bounded by the property now or lately of Norbert Perrett."

This plan represents, with lines and measuremets, not only the · Glendale Plantation, formerly the property of Ranson Brothers, but all of plaintiffs' tracts of land on the upper side, and the Gold Mine Plantation in the rear, formerly the property of Manuel Garcia, who owned it from 1820 to 1843.

Norbert Perrett transferred to Celestin Perrett in 1867, and Celestin Perrett transferred to Mrs. Victor, one of the plaintiffs herein, in 1910. In these transfers the Perrett property is also described as measuring forty arpents deep and bounded "on the lower line by the Glendale Plantation belonging to Messrs. Burch and Champagne."

The Bringier map places the upper depth limit of the Glendale Plantation and the lower depth limit of the Perrett property at exactly the same point "C", on the dividing line of Manuel Garcia or Gold Mine.

185

According to this map the property claimed by plaintiffs forms part of the Norbert Perrett property and not of the Manuel Garcia or Gold Mine Plantation. It forms a triangle with its longest line, or hypotenuse, as the rear line or boundary of Norbert Perret, dividing it from the Gold Mine Plantation; its base as the lower side dividing line from Glendale, and its perpendicular line as the line claimed by defendants. A close scrutiny of the titles leads us to the conclusion that the triangle is the property of plaintiffs and not of the defendants, and that the rear line of plaintiffs' property is the hypotheuse of the triangle, and not the perpendicular line above mentioned.

The defendants objected to the introduction of this map on the grounds that there was no dispute as to the boundaries of the Glendale Plantation, that the sole dispute was concerning the triangle; that the plan purported to be a copy and there was no proof that it was such, nor that the original copy was lost.

Although the boundaries of the Glendale Plantation were not at issue in this case, the map purported to give the lines not only of the Glendale Plantation, but of the properties of Norbert Perret and of the Gold Mine Plantation, all adjacent.

The certificate on the plan is in the following words:

"Aujourd'hui 11 Août 1829. A la requisition de M. M. Ranson Frères, de M. Manuel Garcia representé par sa dame, et en presence des voisins limitrophes, excepté Mme. St. Martin, j'ai du 4 au 11 août, mesuré et aborné leurs terres situées au Bonnet Quarré sur la rive droite du Mississippi dans la Paroisse St. Jn. Baptiste, a environ treize lieues au dessus de la N. Orléans le tout conforme au plan

186

figuratif, ci joint, auquel je me réfère pour les details de l'opération.

(Signed)                        "L. BRINGIER,
                                      "Apr. Gen."

"I certify the foregoing plat of survey and proces verbal to be a true and exact copy of the original deposited in bundle No. AA101 in Surveyor General's Office. In testimony whereof I have hereunto set my hands and the seal of my office in the City of New Orleans this 14th day of August, 1829 year of our Lord and the fifty-fourth of the Independence of the U. S. of America.

(Signed)                         L. BRINGIER,
                                      "Arp. Gen."

Plaintiffs' attorney swears that notwithstanding diligent search he has been unable to find the original of this plan and that it is not annexed to Soniat's act.

G. W. Lawes, Civil Engineer, swears that he has frequently seen the signature of L. Bringier, and that he recognizes the signature to the above plan as that of Ls. Bringier.

We think the above testimony sufficient to justify the introduction of the plan in evidence. There are three ways of proving signatures. 1. By the testimony of witnesses who have seen the party write the particular signature in controversy; 2. By witnesses who know the handwriting of the party for having seen him often sign his name, and 3, by comparison of signatures. *Succn. Lefort,* 71 *So. Rep.,* 215 (220).

The lines established by the plan of Bringier were certainly binding upon Manuel Garcia at whose request they were drawn, and they are equally so upon purchasers from him. At least they will be considered as *prima facie* correct, until proved to be incorrect. C. C. 839 (835).

187

"When the limits have been fixed after due notice to the parties, and no opposition being made, the parties do not thereby lose their right of resorting to a court of justice to rectify the operation if they think it for their interest; but the limits will remain provisionally as fixed, until otherwise determined." *LeBeau v. Bergeron*, 14 A., 489.

The defendants and their main witness, Leopold Tassin, place the line along the perpendicular line of the triangle upon an alleged survey and boundaries of McLaren, Surveyor of St. John Parish, made about the year 1885 at the request of the owner of Gold Mine Plantation. There is no evidence that this survey ever rose to the dignity of a plan, as no one ever saw any. But it is admitted that none of the neighbors were ever notified of McLaren's intended survey, and that his actions were entirely *ex parte*. Under such circumstances, the survey was not entitled to any authority. C. C. 838 (834).

"It is forbidden to every owner of lands to fix the limits between him and his adjoining neighbors, without giving them notice to be present; and without this formality, every such proceeding is null and will produce no effect against his neighbors, who, besides, have their action for damages against him, if they have suffered any injury thereby."

But the defendants say that they and their authors have been in possession of the disputed triangle for more than thirty years and then plead the prescription of ten and thirty years. The burden of proof is upon them to establish it.

Leopold Tassin is about 50 years old; he has been manager and owner of the Gold Mine Plantation from 1885 to 1909. John Hotard was the overseer for 32 or 33 years; the plantation never worked the triangle in dispute; they al-

lowed old colored men to cultivate it for their own account; in 1884, at the time of the Davis Crevasse, his father dug a canal from the public road on the lower line of Gold Mine to within this particular spot where this land is in controversy; as the continuation of that old canal there was an old ditch that continued over into Bayou Rouge and into the Company Canal; the land in controversy is on the upper side of this canal and in the Gold Mine Plantation; there was also a "coulee" running through it. Mr. Tassin annexes a sketch made by himself, showing what he believes to be the line of Gold Mine according to the survey made by McLaren, Surveyor. But the error of his sketch consists in running a straight line from the river to the rear of the plantation, thus taking in a large portion of the Glendale Plantation in the rear to which the owners of the Gold Mine never laid claim; while, according to the Bringier plan, the lower side of Gold Mine breaks at a distance of about 27 arpents from the river and runs in an oblique narrowing line until it meets the rear line.

Angelo Champagne, a member of defendant firm, says the "coulee" runs not "through the disputed part", but in front of it.

Several other witnesses were examined who testified that they cultivated the triangle with the consent of the owners of Gold Mine, but for their own benefit and not for Gold Mine. There is no evidence any where that the owners of Gold Mine were in possession of the triangle as owners or exercised rights of ownership thereon, by cultivation.

On the other hand Fernand Reynaud, one of the plaintiffs, testifies that this triangle is within the 40 arpents depth of their property; that they have been in possession of it since their father bought it in 1867; that they cleared it of wood, and worked it for several years, but afterwards

189

gave it to several laborers to work for their own account, because they "could not cross the canal to go across to work the property" unless they built a bridge; the canal that Mr. Tassin cut in 1884 is near the line of the property, but on the Gold Mine place; he is willing to accept that canal as his line because it is more than he claims; the map made by Mr. Tassin is not correct; there is a boundary post at the extreme end of the 40 arpents of his line.

John Hotard was manager of Gold Mine from 1875 to 1909 during the ownership of Hymel and Fleurion Tassin and his children; none of them ever claimed that triangle or worked it; there was a "coulee" between that strip of land and the Company Canal, and it did not pay to work it; the ditch that Tassin dug in 1884 does not go up to the triangle; it stops before it gets there; he staked out himself; the levee stops at the edge of the "coulee" and discharges there and empties into the Company Canal, and is not on the triangle; he saw that during 25 years: "Every time I would go home I was right there at the triangle"; he never worked at that triangle, but allowed laborers to do so for their own account; the Gold Mine waters drain into this "coulee."

E. G. deBautte testifies that the levee which Mr. Tassin built in 1884 reaches only up to the triangle; Tassin stopped when he was told he was on witness' land; he helped Reynaud plow the triangle.

Joseph Auguste bought in 1869 from Celestin Perrett who had bought from Norbert Perrett; he has always been in possession of the triangle and the Perretts before him; he has allowed several persons to cultivate the land, naming them; the owners of Gold Mine cultivated their plantation up to the Bayou which runs parallel with the boundary line; the "coulee" covers about a quarter of an ar-

pent and the waters of Gold Mine drain through this "coulee".

We come to the conclusion that the defendants have failed to prove their allegations of possession as owners and therefore have not sustained their plea of prescription.

As to their claim of servitude of drain, the only witness who supports it is Mr. Leopold Tassin. He is contradicted by several witnesses. In referring to his testimony Fernand Reynaud says, "he did not know what he was talking about." John Hotard was asked: "Does the Gold Mine Plantation drain in that lower ditch at all? He answers, No. The Gold Mine Plantation drains into the "coulee." He is supported in his testimony by Joseph Auguste. When asked: "What are the waters that drain through that "coulee", he says: "The waters of Gold Mine Plantation." The servitude is not proven.

As to the claim for damages we do not think that this is a case where attorneys' fees or vindictive damages can be allowed, and no actual damages have been shown.

The judgment of the District Court is therefore affirmed-

Opinion and decree, February 19th, 1917.

Rehearing refused, March 19th, 1917.

Writ denied, April 19th, 1917.